793 F.2d 270
 In re FIRST PENN CORPORATION, Debtor,
Kenneth L. SPEARS, Trustee for First Penn Corporation,
Plaintiff-Appellant,
v.
FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver of Penn
Square Bank, N.A., Defendant-Appellee.
 No. 85-1574.
 United States Court of Appeals,
Tenth Circuit.
 June 26, 1986.
 
 Joe L. Heaton (David Pomeroy, of Fuller, Tubb & Pomeroy, with him on brief), Oklahoma City, Okl., for plaintiff-appellant.
 Christopher Byrne, Sr. Atty., Federal Deposit Ins. Corp., Washington, D.C. (V. Burns Hargis and Ross A. Plourde of Reynolds, Ridings & Hargis, Oklahoma City, Okl., with him on brief), for defendant-appellee.
 Before LOGAN and BALDOCK, Circuit Judges, and SAFFELS, District Judge.*
 LOGAN, Circuit Judge.
 
 
 1
 This appeal involves an ownership dispute over an 8.5 acre tract of land. The parties are the trustee of First Penn Corporation, the one-bank holding company for Penn Square Bank, N.A., and the Federal Deposit Insurance Corporation (FDIC) in its capacity as receiver of the bank.
 
 
 2
 Between 1974 and 1981 Penn Square owned the tract and constructed and operated a drive-in bank facility on a portion of it. In July 1981 the bank's board of directors unanimously adopted a resolution authorizing the sale of the tract without its improvements to First Penn for $469,425.68, the exact price Penn Square had paid for the unimproved property in 1974. The directors expressly contemplated a leaseback to the bank of that portion of the property necessary to operate the drive-in.[1]
 
 
 3
 First Penn paid the bank the $469,425.68 in October 1981. Although there is some evidence a deed was prepared, no deed was ever found or recorded. No written lease was ever completed, and no rental payments were demanded or made before the bank failed on July 5, 1982. First Penn did pay the ad valorem taxes due on the property between October 1981 and July 1982.
 
 
 4
 After the bank was closed, the parties agreed to sell the property to a third party for $2,307,000 and agreed to attribute $1,519,000 of the proceeds to the land exclusive of improvements. That sum currently is in escrow. We must decide whether First Penn is entitled to the full amount or if all or part of it belongs to the FDIC as receiver of Penn Square.
 
 
 5
 After several depositions and other discovery, the parties filed cross motions for summary judgment. The district court held that, although there was disagreement about certain facts, no genuine issue of material fact existed that would render summary judgment inappropriate on the dispositive issue of equitable title. The court found there was insufficient evidence of the existence of a valid land sale contract, a requirement for the passage of equitable title. See Manley v. Fong, 734 F.2d 1415, 1417-19 (10th Cir.1984) (applying Oklahoma law); Alfrey v. Richardson, 204 Okla. 473, 231 P.2d 363, 368 (1951). The court emphasized that, although First Penn transferred money to the bank, no agreement on the leaseback terms was ever reached much less written down. It therefore found that no contract existed and that First Penn's claim of equitable title was invalid. The court also found that, if a contract did exist, it would be unenforceable because various documents related to the sale were too incomplete to satisfy the statute of frauds.[2] It therefore granted summary judgment to the FDIC.
 
 
 6
 After considering the arguments and the record fully, we affirm the district court's finding that no contract existed. The record demonstrates repeatedly that the $469,425.68 payment was not intended to be full consideration for the obviously more valuable property. A favorable lease on terms that were never determined was an essential part of the transfer. Additionally, because the bank was to own the building but not the land, some agreement defining rights of use and access to the building would be necessary to the transaction. Regardless of whether a deed to the land could have been produced or proved at trial, the transaction was too indefinite for the courts to enforce. See Firstul Mortgage Co. v. Osko, 604 P.2d 150, 152-53 (Okla.App.1979) (citing Restatement (Second) of Contracts Sec. 32 (1973)); see also Easterling v. Ferris, 651 P.2d 677, 682 (Okla.1982) (rescission of deed possible when act to be done in future "so indispensable a part of what the parties bargained for that contract would not have been made without it."). Cf. Okla.Stat.Ann. tit. 15, Sec. 104 (West 1983) (contract void where object "wholly unascertainable").
 
 
 7
 After the district court ruled against First Penn on its claim to the full $1,519,000 held in escrow, First Penn sought return of the $469,425.68 and its tax payments plus interest. The FDIC did not deny that First Penn was entitled to a claim for the cash purchase price; indeed, in its brief and at oral argument, it acknowledged that First Penn had a right to recover the money it had spent on the property. Rather, the FDIC sought to have First Penn's claim decided in other proceedings before the bankruptcy court in which the FDIC claimed to have asserted counterclaims and set-off defenses.
 
 
 8
 The district court agreed with the FDIC and refused to consider the return of the money. It apparently relied on First Penn's failure to plead in the alternative for the price paid and on the FDIC's argument that its defenses already were raised in the bankruptcy proceeding.
 
 
 9
 We agree with the district court only partially. We are not bothered by First Penn's failure to include an alternative plea for return of its investment in its pleadings. An action to quiet title is one of "equitable cognizance," King v. Oakley, 434 P.2d 868, 873 (Okla.1967), and "[e]quity, having once attached in a proper proceeding, will administer complete relief on all questions properly raised by the evidence, regardless of whether such question or issues are specifically raised by the pleadings." Easterling, 651 P.2d at 680. Cf. Fed.R.Civ.P. 54(c) (prevailing party not limited to relief demanded in its pleadings). It is true, however, that we do not have in the record before us a full exposition of the FDIC's counterclaims and set-off arguments; we have only a reference to the bank's exercise of set-off in its initial and amended pleadings. The determination of the merits of those defenses therefore belongs in the bankruptcy court.
 
 
 10
 Because the relevant facts are before us, however, we believe this is the proper forum to determine, subject to whatever defenses the FDIC may establish in bankruptcy court, whether First Penn is entitled to restitution of the $469,425.68 plus the taxes, interest on those sums, and a lien on the proceeds of the sale of the land. We hold that recovery of the payments First Penn made is necessary to prevent unjust enrichment, as the FDIC effectively has admitted. See Restatement of Restitution Sec. 1 comment a, Sec. 150 (1937). Cf. Beard v. Pierson, 418 F.2d 785, 786 (10th Cir.1969) (repayment necessary after contract rescission); Sarber v. Harris, 368 P.2d 93, 95 (Okla.1962) (action for money "had and received" appropriate "whenever one has the money of another which he, in equity and good conscience, has no right to retain"). The bankruptcy court should factor that debt of the bank to First Penn into its calculation of the competing claims of the parties.
 
 
 11
 The object of restitution is to return the parties to the position that existed before the transaction occurred. See E.H. Boly & Son, Inc. v. Schneider, 525 F.2d 20, 24 (9th Cir.1975). This usually means awarding interest on money that is to be returned, at the legal rate, from the date of its receipt. Id.; Restatement of Restitution Sec. 156, Sec. 157 comment a (awarding value of use of benefit only way to fully restore paying party to initial position). An Oklahoma statute provides that when the damages to be recovered are certain and the date from which the right to recover is determinable, the party is entitled to interest. Okla.Stat.Ann. tit. 23, Sec. 6 (West 1955). The legal rate is six percent. Id. tit. 15, Sec. 266 (West 1985 Supp.). First Penn was entitled to restitution from the time it paid the cash consideration and the taxes; therefore interest at the legal rate of six percent should be added to those liquidated amounts from the time of their payment. See Note, Prejudgment Interest in Oklahoma, 34 Okla.L.Rev. 643, 645-47 (1981). Because 12 U.S.C. Sec. 194 requires ratable distribution, meaning that the bank's creditors should be paid by the receiver in shares proportionate to the value of their claims at the time of insolvency, these interest payments would stop at July 5, 1982, if we find First Penn to be an unsecured creditor. See Kershaw v. Jenkins, 71 F.2d 647, 650 (10th Cir.1934).
 
 
 12
 First Penn raises several arguments in favor of dollar-for-dollar recovery from the escrowed fund, i.e., secured status, rather than the issuance of a receiver's certificate for payment. We do not find that the money First Penn surrendered to the bank in consideration of the anticipated purchase of the real estate was a special deposit or a deposit for a specific purpose against which there can be no set-off. See Glenn Justice Mortgage Co. v. First National Bank, 592 F.2d 567, 569-70 (10th Cir.1979). First Penn placed no restrictions on Penn Square's use of the money. See Northern Sugar Corp. v. Thompson, 13 F.2d 829, 832 (8th Cir.1926) (depositor retains title only if agreement makes clear that money is for specific purpose). First Penn also cannot impress a trust on the FDIC with regard to the money because it cannot trace its payments into a specific fund in the receiver's possession. See Hibernia National Bank v. Federal Deposit Insurance Corp., 733 F.2d 1403, 1407 (10th Cir.1984); Kershaw, 71 F.2d at 649.
 
 
 13
 Nevertheless, under Okla.Stat.Ann. tit. 42 Sec. 30 (West 1979), a purchaser of real property receives a lien upon the land itself in at least some circumstances when the transaction is unenforceable.
 
 
 14
 "One who pays to the owner any part of the price of real property, under an agreement for the sale thereof, has a special lien upon the property, independent of possession, for such part of the amount paid as he may be entitled to recover back in case of a failure of consideration."
 
 
 15
 See also Palmer v. Crews Lumber Co., Inc., 510 P.2d 269, 273 (Okla.1973). Of course, we do not have an enforceable "agreement" for the sale of real property here. But in at least one other Oklahoma case a lien has been extended on equitable grounds beyond the express terms of the statute:
 
 
 16
 "[T]he lien is not based solely upon the contract of purchase, for it has been allowed where the contract was wholly unenforceable on account of the statute of frauds. Clough v. Clough, 1842, 3 B.Mon. 64, 42 Ky. 64. The real basis of the vendee's claim is essentially quasi-contractual, and the lien is merely a remedial device to guarantee, so far as possible, a restoration of the status quo."
 
 
 17
 Schuman v. Board of Commissioners, 184 Okla. 339, 87 P.2d 151, 154 (1939).
 
 
 18
 We believe the Oklahoma courts would treat First Penn as a secured creditor having a lien upon the real property that was the subject of the aborted sale in the circumstances of this case. The lien would transfer to the fund resulting from the sale agreed to by the parties to this controversy. We do not simply award the money to First Penn, however, because First Penn's claim may be subject to set-off or perhaps other defenses. Whether it will prevail over the FDIC depends on the outcome of the litigation in bankruptcy court involving the FDIC's other claims and defenses, and application of the rules set forth in 11 U.S.C. Sec. 506(a).
 
 
 19
 Accordingly, the district court is AFFIRMED in part and REVERSED in part, and the case is REMANDED for further proceedings consistent herewith.
 
 
 
 *
 The Honorable Dale E. Saffels, United States District Judge for the District of Kansas, sitting by designation
 
 
 [1]
 The Penn Square board resolution read:
 "RESOLVED, that the officers of this association, or any of them, are hereby authorized, empowered and directed to sell to First Penn Corporation the real property, exclusive of any improvements thereon, as described in Schedule 1 attached, for the amount of $469,425.68, subject to a lease-back of so much thereof as is necessary to allow for the operation of any improvements thereon.
 RESOLVED, further, that such lease-back shall be on such terms and conditions as such officer of this association deems reasonable and proper."
 R. I, 32.
 
 
 [2]
 Because we find that no contract existed, we do not consider this alternative holding